CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUL 28 2010

JOHN F. CORCORAN, CLERK
BY: /s/ Thompson
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| In re: Peanut Corporation of America, Debtor No. 09-60452<br>Debtor, | |
| In re: Plainview Peanut Co., LLC, Debtor No. 09-61651<br>Debtor, | Case No. 6:10cv027 |
| In re: Tidewater Blanching Co., LLC, Debtor No. 09-61652<br>Debtor. | By: Hon. Michael F. Urbanski<br>United States Magistrate Judge |

## REPORT AND RECOMMENDATION

This matter is before the court on a Motion to Stay and Opposition to Trustee's Desires to Distribute Funds (Dkt. # 20), a Motion for Determination of Surplus of BI Funds and Monetary Valuation of All Eligible Adult Claims (Dkt. # 27), and a Motion to Stay (Dkt. # 29), filed by *pro se* claimant Kenneth Hinton ("Hinton"). The court held an evidentiary hearing regarding the claim filed by Hinton on June 30, 2010. During the course of this lengthy evidentiary hearing, the court heard evidence from both the Trustee and Hinton, and it became very clear that Hinton's claim had no merit. As explained in detail herein, it is **RECOMMENDED** that Hinton's motion be **DENIED** and the Trustee's Motion to Approve Claim Amounts and Authorize Pro Rata Distribution from the BI Fund (Dkt. #3), be **GRANTED** insofar as it relates to the valuation of Hinton's claim at $0. Hinton has engaged in a pattern of filing baseless lawsuits and has been sanctioned by other federal courts. Because of the spurious nature of his claim in this case, which has caused the Trustee to expend significant resources to defend a baseless claim, the undersigned also **RECOMMENDS** that a pre-filing injunction be imposed

on Hinton in this district, requiring him to obtain leave of the court before filing any other lawsuits in this district.

I.

Hinton filed a proof of claim against Peanut Corporation of America ("PCA") in the United States Bankruptcy Court for the Western District of Virginia ("Bankruptcy Court") on March 4, 2009, seeking to recover $5,000,000 for personal injury allegedly caused by PCA.[1] PCA was a manufacturer and processor of peanut butter, peanut paste, and other peanut products that were sold to distributors and manufacturers for use in other products. On January 13, 2009, following the discovery of a certain strain of *Salmonella* bacteria in some of PCA's peanut products ("the outbreak"), PCA issued a nationwide recall of certain peanut products manufactured on or after July 1, 2008. The recall was later expanded by PCA and the Texas Department of Health to include additional peanut products. Many suits were instituted against PCA in connection with the manufacture, sale, handling, and distribution of the allegedly contaminated products, both by personal injury claimants ("Tort Claimants") and by manufacturers and distributors who were customers of PCA and its subsidiaries. PCA commenced bankruptcy proceedings in the Bankruptcy Court on February 13, 2009. PCA's subsidiaries, Plainview Peanut Co., LLC ("Plainview") and Tidewater Blanching Co., LLC ("Tidewater"), filed for bankruptcy on May 22, 2009. The court appointed Roy V. Creasy as Trustee in all three cases.

The Trustee reached a settlement agreement with PCA's insurers, Hartford Casualty Insurance Company and Hartford Fire Insurance Company, who agreed to pay $12,750,000 in

---

[1] Although a copy of Hinton's proof of claim to the Bankruptcy Court was submitted to the court by Hinton, the form does not appear in the Bankruptcy Court's docket report.

2

exchange for complete release from all claims by PCA, Plainview, and Tidewater. $12,000,000 was set aside in a BI Claims Fund ("the BI Fund") in order to pay the Tort Claimants, while $750,000 was reserved to administer the fund. The Trustee then worked with the insurers, counsel for the Tort Claimants, and PCA customers Kellogg and Kanan, Inc., in order to establish procedures by which eligible claimants would receive a portion of the insurance proceeds. The process they devised – the PCA *Salmonella* Claim Settlement and Distribution Procedures ("the Procedure") – required all claimants to submit a Proof of Claim form ("POC form") containing proof of their claim and a description of their injuries, along with any supporting documentation, such as receipts or UPC codes associated with the product that allegedly caused their illness. The Bankruptcy Court entered an order approving the Procedure on October 2, 2009. Both the Procedure and the POC form, which were mailed to all known potential claimants, stated that claims submitted later than October 31, 2009 would be ineligible to receive distributions from the BI Fund. Potential claimants were also informed that by choosing to participate in the claims settlement program, they were not guaranteed a distribution from the BI Fund, and that the final decision rested with the Bankruptcy Court. As authorized by the Procedure, the Trustee retained Alan Maxwell ("Maxwell"), a lawyer with extensive experience in foodborne illness litigation, as Claims Administrator.

During an initial screening of all claims, Maxwell identified 123 claims as potentially eligible to receive a disbursement from the BI Fund. He ultimately determined that 122 claims were compensable. All the parties involved in those 122 claims, including Kellogg and Kanan, Inc., accepted the valuations that Maxwell assigned to the claims. Hinton, whose claim was valued at $0, was the only party who did not accept Maxwell's valuation. Following Hinton's

motions filed in this court objecting to Maxwell's valuation, the court set the matter down for evidentiary hearing on Hinton's claim.

Two witnesses testified at the June 30, 2010 hearing. The Trustee called Alan Maxwell, an attorney from Atlanta with substantial experience in handling foodborne illness cases. Maxwell testified concerning his experience with foodborne illness litigation and stated that he has been involved in every major foodborne illness outbreak in the United States since 2005.

Maxwell identified Trustee's Exhibit 1, which is the Procedure for evaluating the PCA claims. At great length, Maxwell outlined the criteria for eligibility for filing a PCA claim based on this outbreak. Based on his experience with foodborne illness cases and his investigation of this outbreak, Maxwell testified that he believes the claims criteria set forth in § 3.2 of the Procedure to be "absolutely fair." Maxwell stated that these criteria are standard and commonly employed in these sorts of cases to identify claims.

In general terms, § 3.2 of the Procedure outlined three categories of claimants who were eligible for distributions from the BI Fund. The first two categories, Categories A and B, required claimants to produce evidence of a "culture confirmed" infection of *Salmonella Typhimurium*. Category C was defined as:

> [A] person who . . . reports developing symptoms consistent with salmonellosis within 12 and 72 hours of consuming the recalled product(s) and whose claim is supported by the sworn statement of a professional epidemiologist possessing an MD, DVM, or PhD degree stating that the salmonellosis was caused by consuming a peanut product manufactured by PCA, Plainview, or Tidewater.

(Trustee's Ex. 1 at 5.)

Maxwell explained in substantial detail that Category A claims were those that the Centers for Disease Control and Prevention ("CDC") determined, based on analysis of a stool culture, to be genetically identical to the PCA outbreak strain of *Salmonella Typhimurium*.

4

Category B claims required evidence, again based on a stool culture, of a confirmed infection of *Salmonella Typhimurium* "that occurred within the CDC's epidemiological curve with verified consumption of recalled product(s) whose onset of symptoms occurred within 12 and 72 hours of consuming the recalled product(s)." (Trustee's Ex. 1 at 5.)

Maxwell also described the history of the PCA food borne illness outbreak. Maxwell noted that the CDC identified a huge uptick in the number of reported cases of *Salmonella Typhimurium* between September, 2008 and April, 2009. This immediately caused the CDC and other state and federal agencies to begin an investigation into whether there was a common source for the outbreak. Maxwell explained the difference between *Salmonella Typhimurium* and *Salmonella Typhi*. *Salmonella Typhimurium* is typically harbored by animals, whereas *Salmonella Typhi* is typically harbored by humans and is associated with typhoid fever. Maxwell emphasized that *Salmonella Typhi* was never tied to this outbreak, which was ultimately attributed to a single strain of *Salmonella Typhimurium*. He also noted that there were 714 culture confirmed cases of *Salmonella Typhimurium* associated with the outbreak.

## II.

Hinton agreed to participate in the claims settlement program on October 15, 2009. On October 23, 2009, he submitted a POC form and supporting documentation to Maxwell. In the section asking the claimant to identify the product that made him ill, Hinton wrote: "I purchased several variety [sic] of Gold Emblem brand peanut and cashew nut products from CVS and other vendors during January 2009. I suffered from acute symptoms of *Salmonella* gastroenteritis including the onset of nausea, abdominal cramping, and diarrhea in conjunction to being infected

with *Salmonella Typhi*."[2] (Trustee's Ex. 3 at 4.) Hinton indicated that the last date he consumed a peanut product before becoming ill was on January 18, 2009, and that the first date of his illness was January 22, 2009.[3] Hinton alleged wage loss and loss of consortium on behalf of his domestic partner, in addition to medical costs. The form lists two physicians as providing treatment or care for the illness: Dr. Kim A. Bullock and Dr. Eric Greenberg.

According to the records provided by Hinton to Maxwell, Hinton was treated at the Providence Hospital Emergency Department in Washington, D.C. on February 12, 2009 by Kim A. Bullock, M.D. He was diagnosed with generalized abdominal pain, and secondarily with presumed infectious enteritis.[4] A CT scan taken on that day noted that "[t]he possibility of regional enteritis might be considered clinically." (Trustee's Ex. 3 at 21.) Nothing in the Providence Hospital records references *Salmonella* or mentions peanut products or PCA.

Hinton provided a one-page document also dated February 12, 2009 and headed "United Health Care, Inc., Congress Heights Health Center." (Trustee's Ex. 3 at 22.) This medical record noted complaints of abdominal pain, diarrhea, fever, vomiting and infectious

---

[2] Inconsistencies abound between the documents presented by Hinton as exhibits at the evidentiary hearing and those he earlier sent to Maxwell. Specifically, the copy of the completed POC form submitted to the court by Hinton contains several discrepancies when compared to the POC form labeled "Trustee's Exhibit #3: Mr. Hinton's Proof of Claim Form." For instance, the form submitted by Hinton omits the clause "in conjunction to being infected with *Salmonella Typhi*," adds that he also consumed "Keebler" brand products, and lists the duration of symptoms as "2 weeks," compared to the answer on the form received by Maxwell, stating that his symptoms lasted "2 ½ weeks."

[3] The form Hinton sent Maxwell states that the onset of illness occurred on January 22, 2009, while the form Hinton presented in court dates the illness to January 18. At the evidentiary hearing, Hinton did not dispute Maxwell's assertion that Hinton's illness first occurred on January 22, and so this is accepted as the date that Hinton claimed to have become ill.

[4] Enteritis is inflammation of the intestine, usually only referring to the small intestine. Dorland's Illustrated Medical Dictionary 619 (30th ed. 2003).

6

gastroenteritis. Handwritten on the form was "stool test," but no evidence of the result of such a test was provided by Hinton to the Trustee.

Hinton provided the Trustee with five pages of documents purportedly attributable to the office of Eric Greenberg, M.D., 14314 Notley Road, Silver Spring, Maryland 20904. One page of the five is a form Medical Record, entitled "Report of Medical History," which contains information concerning the purpose of the examination, present health and medical history. This form states that the purpose of the examination was as follows:

> Follow-up exam of patient who was diagnosed with acute abdominal pains and gastroenteritis infection attributed to his consumption of a variety of peanut products tainted with S. Typhi bacteria during the past month. Patient chief complaint regarding nausea, diarrhea, headaches, vomiting, stomach cramps and fever for a duration of over three weeks prior to going to emergency room on 2/12/09.

(Trustee's Ex. 3 at 19.)

The second Eric Greenberg document supplied by Hinton was a three-page report of an examination on February 16, 2009. Maxwell testified at the hearing that this record caught his eye as the third page consisted of an attestation under penalty of perjury which was unlike any medical record Maxwell had ever seen in all his years of practice. In pertinent part, the document stated: "CULTURES: Repeat cultures from rectal swab and stool were positive and yielded grown of *Salmonella Typhi*. Patient's faeces [sic] frankly agglutinated when mixed with patient's serum and had the same antibiotic sensitivity patterns." (Trustee's Ex. 3 at 14.) Again, Hinton did not enclose a laboratory report, although the POC form listed laboratory reports as "required documentation."[5]

---

[5] Nor was any report of a foodborne illness concerning Hinton transmitted to the Maryland Department of Health or CDC. At the evidentiary hearing, Maxwell testified that such filings are typical for actual laboratory reports of foodborne illness.

Maxwell conducted an initial review of Hinton's claim and, noting the lack of laboratory culture result required for Categories A and B, the absence of a sworn statement from an epidemiologist required for Category C, and concerns regarding the peculiar format of the Greenberg medical record, set it aside for further scrutiny. Upon further review, Maxwell valued Hinton's claim at $0 due to Hinton's failure to meet any of the criteria set forth in Section 3.2 of the Procedure.

Maxwell explained that Hinton could not qualify for Category A or Category B because he did not provide any record of his culture results. Further, the statement of Dr. Greenberg indicated that Hinton was infected by *Salmonella Typhi*, which is distinct from the *Typhimurium* strain linked to the outbreak by the CDC. Maxwell found no evidence in CDC or state agency records tending to suggest that *Salmonella Typhi* was associated with the outbreak. Because there was no evidence whatsoever that Hinton was exposed to the *Salmonella* strain associated with the PCA peanut outbreak, *Salmonella Typhimurium*, he could not qualify under either Category A or Category B.

As to Category C, Hinton's POC form showed that he became ill on January 22, which was more than 72 hours after his last pre-illness consumption of a peanut product on January 18. Maxwell explained that this fact alone made him ineligible to receive a distribution from the BI Fund, because his illness occurred outside the window of when a person suffering from salmonellosis would begin to show symptoms. In addition to this timing problem regarding onset of the illness, Hinton's claim did not satisfy the requirements of Category C for other reasons. To qualify under Category C, the claim must be supported by a sworn statement from a professional epidemiologist that the illness was attributable to consuming a peanut product manufactured by PCA, Plainview, or Tidewater. No such opinion is reflected in the medical

record from Dr. Greenberg. Nor is there any evidence that Dr. Greenberg is a professional epidemiologist, as required by Category C. Indeed, in attempting to verify Dr. Greenberg's credentials, other problems surfaced. For example, Maxwell testified that his staff could not locate a Dr. Eric Greenberg at the Silver Spring, Maryland address listed on the document provided by Hinton. In checking with Maryland authorities, Maxwell learned that the license number penned next to Dr. Greenberg's signature on page three of Hinton's medical record is not a valid license number for any physician licensed in the state of Maryland. Further, the only "Eric Greenberg" licensed as a physician in Maryland had his license suspended some years ago.[6]

Maxwell added that the Dr. Greenberg document mentioned a stool culture, but no such lab report was ever submitted. Further, Maxwell stated that Hinton never produced any information regarding what Gold Emblem product he purchased, although the claim form required him to do so.

Section 3.1 of the Procedure specified that if a POC form was not properly completed or lacked required documentation, the Trustee would notify the claimant of the deficiencies; the claimant would then have thirty days after the deficiency notice to remedy any defects in the POC form. Maxwell testified that he did not send such a deficiency notice to Hinton because the problems with his claim were incurable. Maxwell summarized that (1) Hinton's own medical records provide that his illness was caused by a strain of *Salmonella* that was unrelated to the outbreak; (2) there was no evidence Hinton consumed a product made with PCA peanuts; (3) Hinton's symptoms did not occur within the timeframe required by Category C; (4) Hinton

---

[6] Hinton had no explanation for any of these troubling anomalies, and stated that perhaps he went to see Dr. Greenberg in a Bethesda office.

9

did not produce an opinion from a professional epidemiologist linking his symptoms to his consumption of a PCA product; and (5) the purported author of Hinton's medical records, Dr. Eric Greenberg, was not a medical doctor licensed and practicing at the address on the records provided by Hinton, much less a professional epidemiologist as required by Category C.

Given the deficiencies in Hinton's submission, Maxwell valued his claim at $0. On March 15, 2010, Maxwell's law firm sent the Master Evaluation Personal Injury Spreadsheet ("Evaluation") to Hinton via e-mail and U.S. regular mail. The Evaluation contained the proposed amounts to be paid to each claimant, including Hinton. In his Motion to Approve Claim Amounts and Authorized Pro Rata Distributions from the BI Fund (Dkt. # 3), which is still pending, the Trustee asks the Bankruptcy Court to value Hinton's claim at $0. At no time prior to the filing of that motion did Hinton make any objection to Maxwell regarding the valuation of his claim.

### III.

In his motions filed in this court, Hinton urges the court to set a hearing in which the Trustee must show cause for the valuation of Hinton's claim, and asks the court to "[c]onsider a thirty (30) day extension to re-evaluate the settlement distribution matrix." Hinton asserts that he is entitled to this relief in light of the fact that "Maxwell has never tried to communicate with Kenneth Hinton . . . [and] has further failed, neglected and acted in bad faith by not facilitating discussions with Claimant to seek possible additional documentation that may have been needed in the determination of [Hinton's] claim." (Hinton's Mot. to Stay at 3.) He also states that he "has never been included in the 'Direct Settlement Negotiations' in accordance with the [Procedure]." (Hinton's Mot. for Determination of Surplus Funds at 2.)

The assertion that Maxwell made no attempt to communicate with Hinton is demonstrably false. The record shows that Maxwell wrote letters to Hinton regarding the claim valuation process on March 9, March 15, and April 23, 2010, well before Hinton filed the present motions. See Trustee's Exs. 4, 5, and 6. In fact, Hinton replied to the March 9, 2010 letter, directing Maxwell to include the suite number in his address in future correspondence. Moreover, Maxwell did not act in bad faith by failing to ask Hinton for additional documentation, given that no number of supporting documents could remedy the key deficiencies in his POC submission. Finally, Hinton's assertion that the Procedure required the Trustee to contact him regarding a settlement is incorrect, since (a) Maxwell determined that Hinton did not have a valid claim, and (b) Section 3.4.1 of the Procedure merely provides that the parties "may" negotiate directly with one another to resolve claims. The Procedure certainly did not require the Trustee to negotiate with a party whose claim lacked any legally cognizable right of recovery.

Evidence presented at the hearing raises additional concerns regarding Hinton's claim. On the POC form he submitted to Maxwell, which asked for a detailed description of the product(s) that caused his sickness, Hinton wrote that he had been made ill by Gold Emblem products. Yet the POC form that Hinton supplied to the court stated that he had consumed Gold Emblem and Keebler products. See supra note 1. Further, Hinton filed warrants in debt in Arlington County General District Court on June 17, 2010 against both Kanan, Inc. and Kellogg, alleging that he sustained injuries as a result of his consumption of King Nut brand products.[7] In the suit against Kanan, Hinton alleges that he became ill after eating King Nut products between

---

[7] The action against Kellogg (Case No. GV10002871-00) is set for hearing on September 9, 2010. The action against Kanan, Inc. (Case No. GV10002870-00) was dismissed.

January 24 and February 4, 2009. Hinton's claim in this case that he became ill after eating Gold Emblem products lies in stark contrast to his claim in Arlington County that he became ill after eating King Nut products, and completely undermines both claims.

At the hearing, Hinton had no credible explanation for the discrepancies in the Greenberg records. Nor did he provide any credible explanation for failing to provide the Trustee with proof of purchase information. When asked by the court about the statement on his claim form that the products he ingested were in his possession, Hinton replied that such evidence was lost in a flood. The court advised Hinton at the hearing that he had seven days to file any additional evidence to support his claim or to file a statement that he intended to withdraw his claim. Hinton stated that he was now satisfied with the information provided by the Trustee and wanted a few days to think about withdrawing his claim.

Plainly, Hinton's claim fails to meet any Category required by the Procedure. Hinton presented no evidence that he was infected by *Salmonella Typhimurium*, the specific strain associated with the outbreak. Rather, the records he provided on their face state that he was infected with another strain of *Salmonella*, *Salmonella Typhi*, associated with human typhoid fever. Hinton presented no culture results required for Categories A and B, and no sworn statement from an epidemiologist required for a Category C claim. The timing of Hinton's claimed onset of symptoms is inconsistent with a valid claim; no proof of purchase information was presented; no opinion linking consumption of PCA products to Hinton's alleged symptoms was presented; significant questions were raised concerning the existence of a Dr. Eric Greenberg and the veracity of the medical records provided by Hinton; and Hinton filed inconsistent claims in Arlington County General District Court.

As a result, it is clear that Hinton's claim was appropriately valued at $0. Accordingly, the undersigned **RECOMMENDS** that Hinton's Motion to Stay and Opposition to Trustee's Desires to Distribute Funds (Dkt. # 20), the Motion for Determination of Surplus of BI Funds and Monetary Valuation of All Eligible Adult Claims (Dkt. # 27), and Motion to Stay (Dkt. # 29), be **DENIED**. The Trustee's Motion to Approve Claim Amounts and Authorize Pro Rata Distributions from the BI Fund (Dkt. # 3) is **GRANTED** insofar as it relates to the valuation of Hinton's claim at $0.

## IV.

The court heard evidence regarding these motions from the Trustee and from Hinton at a lengthy hearing in Charlottesville, which began at 2:00 p.m. on June 30, 2010, and at which time it became manifestly clear that Hinton's claim had no merit. At 4:58 p.m., the court declared a two-minute recess and stated that it wanted to speak to the parties. At 5:00 p.m., court returned, but Hinton was gone. Court security officers advised the court that Hinton had left the building. The court waited for Hinton until 5:16 p.m., but Hinton never re-appeared at the hearing. At the conclusion of the hearing, the court entered an oral Order directing Hinton to file any additional evidence to support his claim, or to withdraw his claim, within seven (7) days. The court also ordered the Trustee to file a statement of fees and costs associated with evaluating and defending Hinton's claim. On July 1, 2010, the court entered a written Order to that effect. On July 2, 2010, Hinton field a Motion to Withdraw his claim, stating that based on the evidence presented at the June 30, 2010 evidentiary hearing, he cannot expect to receive any settlement distribution; does not meet the criteria for the settlement procedures; and concedes and is now satisfied that his alleged *Salmonella* related injuries are non-compensable. On July 6, 2010, the Trustee filed a statement of legal fees and expenses indicating that he had incurred $24,449.09 in fees and

expenses relating to the motion filed by Hinton. Because Hinton voluntarily withdrew his claim before a show cause order was issued pursuant to Fed. R. Civ. P. 11(c)(3), no monetary sanctions may be imposed against Hinton under Rule 11. See Fed. R. Civ. P. 11(b)(5). However, Hinton's conduct in pursuing a bogus claim constitutes an abuse of the judicial process and is deserving of sanction.

Other courts have sanctioned Hinton's bad faith use of the judicial system by requiring him to seek the permission of the courts before commencing a civil action in those jurisdictions. See, e.g., Hinton v. Equifax Info. Servs., No. 1:09cv1061, 2010 WL 2405652 (E.D. Va. Apr. 26, 2010); Hinton v. SupportKids, Inc., No. A-09-CA-284 LY, 2009 WL 1650483 (W.D. Tex. June 11, 2009).[8] Both the Eastern District of Virginia and the Western District of Texas, noting Hinton's "lengthy history of filing frivolous lawsuits,"[9] invoked their inherent power to control their dockets in order to institute pre-filing injunctions against Hinton. Equifax, 2010 WL 2405652 at *2; SupportKids, 2009 WL 1650483 at *2. Hinton's conduct in this case falls into the same pattern of abuse that he has displayed in previous actions; accordingly, the undersigned **RECOMMENDS** that Hinton be enjoined from filing any action in the Western District of Virginia without first obtaining leave of court, which will not be granted unless the action is (1) not frivolous, (2) filed in good faith, and (3) a new claim that has not been disposed of by any court in any previous action. It is further **RECOMMENDED** that the Clerk not accept any filing from Hinton without first verifying that he has the written permission of a judicial officer

---

[8] Two months after he was denied *in forma pauperis* status and barred from filing any action in the Western District of Texas without written permission from the court, Hinton filed a warrant in debt against the same defendant in Arlington County General District Court.

[9] Hinton has filed over fifty lawsuits in at least a dozen federal districts over the course of the past decade. See Equifax, 2010 WL 2405652 at *2 n.1.

14

to file it. In addition, because of the circumstances of Hinton's claim as set forth herein, the court will provide a copy of this Report and Recommendation to the United States Attorney for the Western District of Virginia for any investigation and action he deems appropriate.

V.

The Clerk of the Court is directed immediately to transmit the record in this case to the Honorable Norman K. Moon, United States District Judge. Both sides are reminded that pursuant to Rule 72(b) they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objection.

The Clerk of the Court is hereby directed to send a certified copy of this Report and Recommendation to all counsel of record.

Entered: July 27, 2010.

Michael F. Urbanski
United States Magistrate Judge