CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

AUG 25 2010

JULIA C. DUDLEY, CLERK
BY: /s/ 
  DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| In re: Peanut Corporation of America, Debtor No. 09-60452     Debtor, | |
| In re: Plainview Peanut Co., LLC Debtor No. 09-61651     Debtor, | Case No. 6:10CV027 |
| In re: Tidewater Blanching Co., LLC Debtor No. 09-61652     Debtor. | By: Hon. Michael F. Urbanski United States Magistrate Judge |

## REPORT AND RECOMMENDATION

This matter comes before the court on a multitude of motions from the Bankruptcy Trustee, Counsel for Claimants, and the *Guardians ad litem* for minor claimants. Together, all of these motions seek the approval of an elaborate settlement between the Claimants, the bankruptcy estate, and Kellogg as well as the corresponding distribution of the twelve million dollar BI Fund pursuant to Federal Rule of Bankruptcy Procedure 9019. The parties provided extensive briefs in support of their proposed settlement, as well as exhaustive factual materials. Finally, all parties participated in several hearings in front of the undersigned on a variety of issues, culminating in a hearing in Lynchburg on August 19, 2010. For the reasons detailed below, the undersigned **RECOMMENDS** that the settlement agreements be approved and the distribution of the BI fund proceed according to the terms of the settlement agreements.

I. **General Background**

Peanut Corporation of America and its subsidiaries[1] (collectively, "PCA") all filed voluntary petitions under Chapter 7 of the Bankruptcy Code early in 2009. Roy V. Creasy was

---

[1] Plainview Peanut Co., LLC and Tidewater Blanching Co., LLC.

appointed as Trustee. PCA was a manufacturer and processor of peanut butter, peanut paste and other peanut products. PCA distributed these peanut products to other manufacturers for incorporation into a variety other food products until January 13, 2009, when PCA instituted a nationwide recall in response to the discovery of *Salmonella* bacteria in some of their peanut products. Due to the contamination of the PCA products with *Salmonella*, and the consequent illnesses across the nation, suits were filed and claims asserted against PCA by many parties. Persons allegedly infected by the *Salmonella* in PCA products had claims for personal injuries ("Tort Claims"), manufacturers and distributors had claims for compensation they had incurred in connection with the recall of PCA's products ("Recall Claims"), and those manufacturers who were also sued by injured consumers had claims for contribution of indemnity against PCA ("Contribution Claims"). To defend these claims, PCA would turn to the Commercial General Liability and Umbrella Liability insurance policies they owned, policies underwritten by Hartford Casualty Insurance Company ("Hartford Insurance").

In lieu of independently litigating all of these various claims, as well as coverage disputes between the Bankruptcy Estate and Hartford Insurance, the Trustee elected to seek a global resolution of these claims. After negotiations between all of the interested parties, the method elected was that the Trustee would sell the insurance policies to Hartford Insurance for $12,750,000. The lion's share of this amount, $12,000,000, would be set aside in the BI Fund and would be reserved for paying the Tort Claims. The remaining $750,000 was available to the Trustee for expenses incurred in connection with setting up a claims resolution process ("the Procedures") for the Tort Claims. The manufacturers and distributors, specifically Kellogg and Kanan, Inc., who had asserted some Recall Claims and would also possess Contribution Claims would not be permitted to seek monies from the BI Fund. Although the manufacturers would not

receive any monies from the BI Fund, to the detriment of their Recall and Contribution Claims[2], they would be permitted to participate in the settlement process alongside the BI Fund in an attempt to reach a complete settlement of each Tort Claim. Although Kanan Inc. was permitted to participate in the settlement process, it appears to the Court that they have not taken advantage of this opportunity. Kellogg, on the other hand, has reached settlements with the vast majority of claimants.

The precise machinations of the Procedures, as approved by the Bankruptcy Court, revolved around the evaluation of each claim by a claims administrator, in this case, Alan Maxwell, an expert in food borne illness litigation. Individuals who believed they were injured by the *Salmonella* in PCA products would be required to complete a proof of claim form and submit that form, along with any required documentation, to the Trustee. To be considered for a distribution from the BI Fund by the claims administrator, a claimant had to meet one of several criteria set forth by the Trustee: (A) have a confirmed case per the CDC's definition of a *Salmonella* infection from the PCA outbreak; (B) have a confirmed infection of the correct type of *Salmonella* as well as a verified consumption of recalled PCA products; (C) have a verified consumption of recalled PCA products, symptoms consistent with a *Salmonella* infection, and the opinion of an epidemiologist that the infection was caused by the PCA *Salmonella*. The Claims Administrator originally identified 123 potentially eligible claimants, but later determined that one of these claims was without merit.[3]

---

[2] These claims they could assert against the remaining assets of the bankruptcy estate, which the court has been told amounts to approximately $1,000,000. According to testimony at the hearing, the outstanding claims against this $1,000,000 are approximately $320,000,000 – meaning that the contribution claims and recall claims of Kellogg and Kanan, Inc., are valued at pennies on the dollar.

[3] The undersigned recommended that the claimant whose claim was determined to be without merit, Mr. Hinton, be excluded from the settlement of the fund and be subject to a pre-filing injunction in the Western District of Virginia. See Dkt. No. 102.

3

For all 122 other eligible claimants, including forty five minor claimants and nine wrongful death claimants, the precise value of their claim was to be determined through a three way negotiation between counsel for the claimant, counsel for Kellogg (or Kanan, Inc.), and the Trustee, with the assistance of Alan Maxwell. These negotiations eventually resulted in Maxwell creating a matrix which would account for the specific circumstances of all the claimants and assign each claimant a presumptive claim value. According to Maxwell's valuation, the total value of all the valid claims was approximately $15,000,000. Because the BI Fund contained only $12,000,000, the actual pay out on each claim was reduced *pro rata* to 79.00166% of the value Maxwell had assigned the claim.[4]

The undersigned closely reviewed the appropriateness of Maxwell's valuation method for all claims, and the fairness of his conclusion with respect to both the wrongful death claims and the minor claims. But at the same time as Maxwell valuation was being determined, the claimants and Kellogg and Kanan, Inc. continued to negotiate for potential additional payments to the injured claimants. Settlements between adult claimants, represented by counsel, and the manufacturers are not before the court. For the two wrongful death claims which have settled with Kellogg, the Court also evaluated the Kellogg settlement for fairness. Each of the minor claimants were appointed a *guardian ad litem* who evaluated the fairness of the total settlement to the minor, as well as the disposition of the minor's recovery. The undersigned also evaluated for fairness the minor claimants' settlements with Kellogg. No settlements were reached by any minor claimant or wrongful death claimant with Kanan, Inc.

---

[4] The only claims that are not reduced to 79.00166% are what the parties have referred to as "orphan" claims. These claims are demonstrably related to the PCA *Salmonella* outbreak, but cannot be tied to any manufacturer or distributor. Thus, because this entire settlement was predicated on the ability of the parties to have a secondary recourse with the manufacturers, all parties agreed at the outset that the orphan claims would receive 100% of their claim, as determined by Alan Maxwell.

4

## II. Jurisdiction and Procedural Compliance

### A. *The Court Has Jurisdiction Over The BI Fund*

The BI Fund consists of funds that Hartford Insurance paid in exchange for the retirement of policies that Hartford Insurance had previously sold to PCA. Thus, these funds are quite rightly considered to be assets of the bankruptcy estate. See A.H. Robins Co., Inc., v. Piccinin, 788 F.2d 994, 1001 (holding that a "products liability policy of the debtor...is a valuable property of the debtor...and may well be the most important asset of the estate") (citation omitted). And, because the distribution of these funds is to resolve personal injury claims against the bankruptcy estate, it is properly before the district court to approve these settlements. See 28 U.S.C. § 157(b)(5).

### B. *The Court Has Jurisdiction To Approve The Kellogg Settlements*

The Court has also been asked to approve settlements between the eligible claimants and Kellogg, a non-debtor third party. Although the settlement agreements between Kellogg and the eligible claimants involve monies which are not part of the bankruptcy estate, these settlements will have "an impact[] upon the handling and administration of the bankruptcy estate." Owens-Illinois, Inc., v. Rapid Am. Corp. (In re Celotex Corp.), 124 F.3d 619, 625-26 (4th Cir. 1994) (citations omitted). See also Valley Historic Ltd. P'ship v. Bank of N.Y., 486 F.3d 831 (4th Cir. 2007). This requirement springs from 28 U.S.C. 1334(b), which provides district courts with original jurisdiction for all civil proceedings "related to" cases under Title 11. It is well established law that "suits between third parties which have an effect on the bankruptcy estate" are proceedings that are "related to" the bankruptcy. Celotex Corp. v. Edwards, 514 U.S. 300, 308 n.5 (1995).

Here, the settlement agreements between Kellogg and the eligible claimants have *already* had a fundamental effect on the handling and administration of the bankruptcy estate. In fact, Kellogg's participation was crucial to formation of the original agreement by all parties to create the BI Fund, an agreement approved by the Bankruptcy Court on October 2, 2009. See Slip Opinion, Order Approving Settlement Agreement, Bankruptcy Action No. 09-60452, October 2, 2009. The Procedures envisioned in the original agreement recognized the essential fairness of including the manufacturer's settlements by stipulating that "orphan claims" would recover 100% of the value assigned by the claims administrator, while claims that could recover further from Kellogg or Kanan, Inc. would receive only 79% of Maxwell's valuation. Moreover, because the Procedures required joint negotiation on the amount of recovery for the eligible claimants, the court also possesses jurisdiction over the Kellogg settlements that have been reached with the eligible claimants because these claimants may not settle with the bankruptcy estate without the additional funds supplied by Kellogg. A failure to settle with the BI Fund would necessarily affect the "administration of the bankruptcy estate." In re Celotex, 124 F.3d at 626. Finally, the settlements between Kellogg and the eligible claimants also "relate to" the bankruptcy proceeding because Kellogg will have a contribution claim against the remaining Bankruptcy Estate.[5] The Fourth Circuit has specifically held that future contribution claims can form the basis for "relating to" jurisdiction when they affect the liabilities of the bankruptcy estate. In re Celotex, 124 F.3d at 626 ("Any recovery...would reduce Owen's claim against the Celotex bankruptcy estate for contribution by the same amount, thus altering the liabilities of the Celotex bankruptcy estate.").

---

[5] The Trustee informed the Court that the remaining assets of the estate amount to approximately one million dollars, while the outstanding claims are approximately 320 million dollars.

### C. *Procedures For Death Claims And Minor Claims Are Appropriate*

In approving the proposed settlements that relate to the wrongful death claims, the court is sitting in bankruptcy jurisdiction. As such, the court does not have to hew to the wrongful death procedures set forth in Virginia law, such as requiring qualification of estate representatives in Virginia. The claims for wrongful death may arise under state law, but because "the bankruptcy code is superimposed upon the law of the State which has created the obligation," it is the specific policies that underlie the Bankruptcy code which the court must implement. Grady v. A. H. Robins Co., Inc., 839 F.2d 198, 202 (4th Cir. 1988). Under bankruptcy law, foreign personal representatives in wrongful death claims will have standing to assert a claim against the bankruptcy estate. See 11 U.S.C. § 101(15); In re Evans, 114 B.R. 434, 437-38 (Bankr. E.D.Pa. 1990) ("a party who has been designated, under the terms of applicable state law, as the personal representative....can maintain an action for statutory damages on behalf of the [decedent's] estate."). The undersigned determined, therefore, that because the wrongful death claims arose under various different state laws, the settlement of each wrongful death claim should comply with the law of the state where the claim arose.[6] Accordingly, counsel for each wrongful death claimant supplied the court with evidence that each personal representative was qualified in the state where the action arose, and that the settlement complied with all statutory requirements of that state.[7] With these motions, the counsel for the wrongful death claimants have complied with the court's instructions and suitably demonstrated that the settlements of these claims comply with applicable state law.

---

[6] Additionally, as was explained by the Trustee at the August 18, 2010 hearing, the claims administrator Alan Maxwell took the particularities and differences of state law into account in formulating his expert opinion on valuation of the wrongful death claims.

[7] See Motion for Settlement by Estate of Betty Banks Shelander, Dkt No. 123; Motion for Settlement by Estate of Minnie Borden, Dkt. No. 124; Motion for Settlement by Estate of Robert Otis Moss, Dkt. No. 138; Motion for Settlement by Estate of Nellie Napier, Dkt. No. 143 (as amended by Dkt. No. 200); Motion for Settlement by Estate

7

Although the court might have chosen to rely on its bankruptcy jurisdiction to determine a proper procedure to protect minor claimant's interests, the undersigned deemed it more appropriate to evaluate minor's settlements under state law. "The rules governing settlement of minor's claims are embedded in traditional state-law domain of contract, agency, and family law. Rather than developing federal common law to govern such questions of authority, we can instead rely on the well-established rules of the various States." Reo v. United States Postal Serv., 98 F.3d 73 (3d Cir. 1996). Court approval of a minor claimant's settlement, under Virginia law, will be granted if the compromise is in the interest of the infant. Va. Code § 8.01-424. And the interests of the minor claimants are further protected because federal courts are always charged with the duty of seeing that the minor is properly represented, the minor's interests have not been sacrificed, and the compromise is to the minor's advantage. Carter Coal Co. v. Litz, 54 F.Supp. 115 (W.D.Va. 1943); see also Friends For All Children, Inc. v. Lockheed Aircraft Corp., 567 F.Supp. 790 (D.D.C. 1983).

To make certain the interests of the minor claimants were well represented, the Court appointed *guardians ad litem* for each minor claimant. See Orders Granting Motions to Appoint *Guardian Ad Litem,* Dkt. Nos. 91, 98, 104, 107. The two *guardians ad litem*, David Carson and Gary Coates, reviewed all aspects of the minor's claims: medical records, medical bills, health department information, expert reports, and other pertinent information.[8] Carson and Coates talked to at least one parent of each minor. Both reviewed in detail the settlement agreements which the parents had reached with the BI Fund and with Kellogg. The *guardians ad litem*

---

of Doris Flatgard, Dkt. No. 144 & 203; Motion for Settlement by Estate of Clifford Frederick Tousignant, Dkt. No. 146 (as Amended by Dkt. No. 209); Motion for Settlement by Estate of Shirley Almer, Dkt. No. 156 & 201; Motion for Settlement by Estate of Hester Fields, Dkt. No. 165; Motion for Settlement by Estate of Margie Parsons, Dkt. No. 167.

[8] Whereas David Carson provided the court with written descriptions of the underlying circumstances of each minor claims, counsel for the minor claimants represented by Gary Coates provided an explanation of these circumstances and illness of each of his minor clients.

recommended in each case that the settlement of the claim, being in the best interests of the minor in accordance with Va. Code Ann. § 8.01-424, should be approved. Because the settlement provided for payments in the future, each *guardian ad litem* made sure that the interests of the minor were protected by assuring that these payments were backed by statutorily sanctioned insurance companies, per Va. Code. Ann. § 8.01-424(C). Thus, the undersigned concludes that the procedural requirements under Virginia law were met and that the settlement process and result were in the best interests of the minor claimants.

### III. Valuation Process and Settlements Are Fair

Beyond assuring that the procedural requirements for the wrongful death claims and the minor claims were met, the court was also tasked with approving the entire settlement process as fair to all creditors. To this end, the court received evidence from the claims administrator, Alan Maxwell, on the process he used to determine the value of each claim.

#### A. *Maxwell's Process Was Fair To All Claimants*

Alan Maxwell was chosen by the Trustee as the claims administrator for the settlement process. Maxwell is an attorney with the law firm of Weinberg, Wheeler, Hudgins, Gunn & Dial, LLC. He has been defending food borne illness claims for over 11 years, and focusing exclusively on the defense of companies implicated as the source of food borne illness outbreaks for over five years. In the course of his work he has reviewed thousands of claims by individuals suffering from *Salmonella* infections and other food borne illnesses. In his capacity as claims administrator, Maxwell was asked to receive, process, and review the *Salmonella* proof of claim forms as well as the supporting documentation, and to determine that the claimants were eligible claimants with valid claims. As described *supra*, to be deemed eligible, a claimant had to fall within one of three categories of claims (A, B, or C) – depending on the strength of the

causation evidence that the *Salmonella* infection originated from PCA product. After determining the claimant's eligibility, and having considered the totality of the evidence relating to each claim, Maxwell was to assign settlement values to all qualifying claims.

In determining the settlement values for these claims Maxwell considered a wide variety of factors. Maxwell began with a verification of the medical expenses, days of total illness, hospital stays, Emergency Room visits, Doctor's Office visits, and incurred lost wages. Next, Maxwell created classes based on severity of the infection – which they determined by the course of treatment and the length of the illness. For example, 1-2 ER or Office visits and a course of infection of less than seven days was the lowest category, while the highest category included those infections which required to hospitalizations of over six days in length. Next, Maxwell assigned a rough valuation range to each of these categories, $20,000-$25,000 for the least severe category, and $100,000-$200,000 for the most severe category. These valuation ranges were created by consulting a database of past *Salmonella* infection settlements from earlier outbreaks – taking into account additional criteria such as the permanency of any effects, the age of the afflicted individual, and all incurred medical expenses. Although this matrix of claims was the starting point, Maxwell would often adjust some claim valuations on the basis of additional factors. Chief among these was the strength of the causation evidence. Whereas claims within the causation categories A & B were considered strong causation cases, those in category C were considered weaker and had $5,000 deducted from their values. Finally, those claimants who suffered particularly long lasting illnesses or hospitalizations beyond those levels set forth in the matrix were given enhancements in the value of their claim. Importantly, however, all of these valuations were made in a sterile environment of bankruptcy, with no

consideration given to possible punitive damages, nor to ongoing business concerns such as adverse publicity for the manufacturers.

For the wrongful death claims, Maxwell also considered the jurisdiction in which the death occurred. This involved reviewing the wrongful death statute for that jurisdiction to determine legal damages, discussion with counsel from that jurisdiction, and research into jury verdicts and settlements reached in those jurisdictions on other wrongful death claims. Maxwell also considered the circumstances of the decedent: age, pain and suffering, employment status, funeral expenses, and family relationships.

After Maxwell reached what he felt to be an appropriate rough valuation for each claim, Maxwell supplied copies of Valuation Spreadsheet[9] to counsel for both the Tort Claimants and Kellogg and Kanan, Inc. as well as an explanation of his valuation process. Each of these parties was encouraged to identify any flaws in the valuation methodology, particularly mistakes in omitting or misapplying some valuation criteria, alternative information on past valuations in *Salmonella* settlements, and legal analysis on the wrongful death cases. Following this collaboration, Maxwell made additional changes to the Valuation Spreadsheet. When Maxwell then released his final version, counsel for the Tort Claimants and for Kellogg and Kanan, Inc. all approved of the amounts and valuations ascribed to every individual claimant.

Given the thoroughness of Maxwell's analysis, and the consideration of the multitude of relevant factors which entered into his analysis, the undersigned concludes that the process of valuation undertaken by Maxwell is fair and equitable to all parties. Considering that each counsel for the Tort Claimants agreed not simply to the valuations ascribed to their clients, but rather to the valuations ascribed to *every other claimant*, the proposed distribution appears to be

---

[9] Capitalized terms used herein but not otherwise defined were defined in the Motion to Approve Claim Amounts and Authorize Pro Rata Distributions from the BI Fund. Dkt. No. 3.

substantially equitable and fair to all parties. Nevertheless, the total settlements that this court was asked to approve consist of more than simply the Maxwell valuation (reduced *pro rata*). And these total settlement figures often have vast differences in settlement funds provided by Kellogg, resulting in a larger variance among the total settlements received by each claimant. A considerable portion of the hearing on August 18, 2010 was devoted to these variances.

### B. *Wrongful Death Settlements With Kellogg Are Fair*

It is the conclusion of the undersigned that the wrongful death settlements that the claimants reached with Kellogg, though disparate, are fair. For example, although Maxwell assigned a value of $250,000 to the claim of Robert Otis Moss, and $275,000 to the claim of Minnie Borden, Moss settled with Kellogg for an additional $400,000 and Borden settled for only an additional $180,000. Counsel explained, convincingly, that these distinctions derived primarily from his opinion on causation with respect to Moss. Moss did not die until one year after his *Salmonella* infection – which counsel opined would lead a jury to conclude that the entire last year of his life was filled with suffering. Counsel explained, moreover, that given this analysis the family would be willing to pursue a more aggressive negotiating stance with Kellogg. And considering that the Maxwell valuation was reached in a "sterile bankruptcy environment," it is clear that this discrepancy between Maxwell's valuation and Kellogg's valuation can be sensibly explained. Thus, for both of these settlements with Kellogg, the undersigned believes them to be fair and equitable to the claimants.

### C. *Minor Claimant Settlements With Kellogg Are Fair*

As with the wrongful death claimants, there are several minor claimants who are asking the court to approve settlements with Kellogg which are substantially larger than the valuations provided by Maxwell. These different settlements with Kellogg result in a different overall

picture of the variety of minor claimants' total settlements. For example, with the exception of the minor S.S., all of the minor claims were valued by Maxwell at $115,000 or less, with a large majority valued between $25,000 and $50,000. The total settlements, however, again excluding S.S., range up to $290,000 with many settlements worth more than $100,000. There are several cases where Kellogg is providing settlement funds which are greater than the Maxwell value. The undersigned questioned counsel for the minor claimants and counsel for Kellogg on these discrepancies, focusing particularly on whether the values reached in the Kellogg settlements called into question the underlying fairness and correctness of the Maxwell valuation. Having considered the evidence provided by counsel as to all of these discrepancies, the undersigned concludes that the settlement values reached in negotiation with Kellogg are fair and equitable to the minor claimants and do not call into question the separate valuation assigned by Maxwell.

The differences between Maxwell's valuations and Kellogg's valuations, according to counsel, derive from a few major factors. First, the expectation of the plaintiff's counsel and the parents of the minor child at the beginning of the process. Counsel for the minor claimants explained that they assign, at the outset, a valuation which they believe is appropriate for each claim. When the Maxwell value matched counsel's and the parent's expectation, the incentive to pursue further remuneration though settlement with Kellogg was reduced. This explains the odd fact that minor S.S. was assigned a value of $395,000 by Maxwell, and yet Kellogg offered S.S. no additional money. Counsel for S.S. explained that the Maxwell valuation was exceptionally close to his expected value of the claim, and there was little additional value to be sought from Kellogg.[10] Similarly, if Kellogg's expected value of the claim is close to the Maxwell valuation, Kellogg's incentive to contribute additional funds is reduced because they anticipate their

---

[10] Counsel for minor claimant C.C. explained that a similar situation arose with the valuation assigned by Maxwell as to C.C.'s claim.

13

potential liability being small, thanks to an offset from the BI Fund payout. This expected valuation phenomenon also explains the case of the twins B.B.T. and B.L.T. Here although Maxwell assigned one twin a value of $100,000 and the other a value of $50,000, the total settlement for each was $84,000. This value of $84,000 was both close to counsel's expected value of each claim, and perhaps more importantly, in keeping with the expectations of the parents of these twins that both would receive similar settlements. The phenomenon of matching expectations appeared again with the case of minor claimant F.B. This minor claimant was assigned a value by Maxwell which very nearly matched counsel's expectations, and thus the settlement with Kellogg was correspondingly small compared to the total value of the claim.[11]

The undersigned recognizes that it is inherent in a process such as this for different parties to have different valuation expectations. The mere existence of these differences, therefore, can not be considered evidence that certain valuations are necessarily flawed. It also follows that when different parties' valuation expectations coincide the incentive to seek additional remuneration from Kellogg would be reduced. Accordingly, the fact that Kellogg has contributed no money to some claims does not indicate that a fair value has not been reached.

The second major factor is also an example of different expectations, but in reverse. In certain cases, the parents of the minor claimant and counsel for the minor claimant had much higher expected values for the claim than Maxwell's valuation. These expectations were usually shaped by factors which were not as central to Maxwell's valuation. For example, minor C.M. was assigned a value of $115,000 by Maxwell. Kellogg, however, settled with C.M. for an additional $200,000. Counsel explained that although C.M. was not hospitalized for a substantial period of time (a major factor in Maxwell's valuation), his conversations with C.M.'s

---

[11] In the case of F.B. it is clear that Maxwell's causation analysis and Kellogg's causation analysis were significantly different. In the opinion of the undersigned, however, both should be considered reasonable from their perspectives.

parents indicated that the effect the infection had on C.M. was substantial, disruptive and long lasting. In fact, C.M. is still undergoing a course of antibiotics because *Salmonella* is still present in his GI tract. Similarly, minor B.W. did not require extensive hospitalization but suffered from lingering effects of the infection as well as complications which likely arose from the original *Salmonella* infection.[12] In the case of minor R.S., Maxwell's valuation was based on the medical bills which were abnormally low. Accordingly, counsel for R.S. expected a higher valuation based on the severity of the illness, but with medical bills abnormally low, the Maxwell valuation lagged counsel's expected recovery for the minor claimant. Overall, counsel for all the minor claimants provided cogent, reasonable explanations for the different values assigned by Kellogg and by Maxwell. And the court, as explained above, recognizes that mere differences of opinion in circumstances like these are not, by themselves, indicative of inequitable results. Thus, the undersigned concludes that the minor settlements with Kellogg are fair and reasonable under all of the circumstances and, most importantly, in the best interests of the minor claimants.

IV.     **Distribution Of Funds and Attorneys' Fees**

   *A.     Guardians Ad Litem Have Set Up Annuities For The Minor Claimants*

Both *Guardians ad litem* have set up annuities for their minor claimants. These annuities are paid out to the minor claimants once they reach the age of 18. Some annuities are paid out semi-annually once the minor reaches the age of majority, some have benefits paid out in more elaborate schemes. In all of these cases, however, the net settlement being paid by the defendants PCA and Kellogg presently will result in more substantial sums being made available to the minor later in life – most likely when these claimants are about to enter college. All of

---

[12] It appears from testimony at the hearing that B.W. became infected with MRSA following his hospital stay for the *Salmonella* infection, a factor which, were the case to go to trial, might lead to extensive additional liability for Kellogg.

15

these annuities are backed by insurance companies authorized to do business in the state of Virginia and rated "A plus" (A+) or better by Best's Insurance Reports, in accordance with Va. Code Ann. § 8.01-424(C). The undersigned is satisfied that these arrangements are in the best interests of the children.

### B. Funds Paid to the Parents for the Benefit of the Children are Approved

Several parents of minors have requested that portions of the settlement monies be set aside to reimburse the parents for out-of-pocket expenses, such as medical bills. Such reimbursement is appropriate and reasonable. A few parents have also requested that monies be set aside to be paid directly to the parents, to be used for the sole benefit of the minor claimant, the stated reason being they wish to enroll the student in private school. The court has examined each of these instances, and the amounts being paid to the parents in each case are a very small portion of the total settlement proceeds. On balance, the court also believes that these payments are appropriate and reasonable.

### C. Attorney's Fees Are Excessive And Marked Down To 33-1/3%

This court has been asked to approve a very few settlements which call for attorney's fees of well over 33-1/3%. For example, the attorney's fee provided for in the settlement agreement of Robert Otis Moss is 40%. The attorney's fee provision in the Margie Parsons settlement is fully 45%. Both of these attorney's fees provisions are excessive in the context of this overall global settlement in which the vast majority of fee agreements are at the 33-1/3% level. Moreover, the attorney's fees for these two settlements arise in the settlements which are the highest to date. In the case of Margie Parsons, the settlement figure of $987,520.00 would result in a net award of attorney's fees of $444,384.34. Given the particular context of this and considering the global nature of the settlement reached, the relatively recent occurrence of these

claims, the absence of any protracted litigation on any individual claims, and the economies of scale available to the law firms involved, the court views an attorney's fee in excess of 33-1/3% to be excessive, and does not recommend approval of any fee over 33-1/3%.[13] Accordingly, the undersigned recommends that the attorney's fees provisions in the Parsons and Moss settlements be reduced to 33-1/3%. Even at this reduced level, the attorney's fees will total significant sums. In the case of Robert Otis Moss, the fee award will still be approximately $198,968. In the case of Margie Parsons, the fees will still reach the sum of approximately $328,844. It is noteworthy that these awards still dwarf the award sought by counsel in the Tousignant wrongful death settlement, a mere 20% of the settlement of $217,254.00 – or only $43,450.91.

### V. Trustee's Request For Distribution Of Administrative Funds Is Approved

The Trustee notified the court at the 11th hour that the administration of the bankruptcy estate had entailed costs greater than the $750,000 which had been previously agreed upon by all parties. In fact, the Trustee's costs were so extensive (and his investment returns so incredibly limited) that his request exceeded even the safety valve for cost overruns imagined in the agreement, *i.e.,* the interest earned on the $12,000,000. The undersigned is mindful of the outstanding efforts of the Trustee and his counsel to put together this global resolution of a serious case. However, given that all of the parties have agreed to specific dollar settlement and the annuity figures have been agreed upon with the insurers based on these specific dollar values, the court does not believe that the payments to the claims under the BI Fund should be reduced to defray the Trustee's expenses. It is the court's view that the benefits to all of the parties, including the Trustee, achieved in this global settlement would be substantially undone if the

---

[13] The undersigned notes that there are a limited number of settlement agreements which provide for attorney's fees of 35% rather than 33-1/3%, a distinction which should be considered neither material nor excessive. It is recommended that the fee agreements of 35% be approved. The undersigned also notes that these recommendations apply only to the settlement agreements for minor and wrongful death claimants.

apple cart is upset at this late date. At the hearing on August 18, 2010, the court offered the parties the opportunity to reach an agreement between themselves – Plaintiffs' counsel, the Trustee, Trustee's counsel, and Kellogg – which would avoid asking the court to dip into the settlement funds. The court instructed the Trustee to file a motion with the court if the Trustee wished to renew his request for additional funds. No such motion was filed. Thus, the undersigned recommends approval only of the distribution to the Trustee of the original administrative set-aside of $750,000, as this original amount protects the interests of all the tort claimants and the workability of the settlement agreements.

## VI.  Conclusion

All parties involved in the distribution of the BI fund and the settlement of the multitude of personal injury claims against PCA and Kellogg were tasked with a complicated and difficult problem. They endeavored to reach an agreement between all parties that splits the available funds in a fair and equitable manner. After considering all of the evidence provided by the parties, and after a thorough hearing on the complex and inherently nebulous issues of valuation, the undersigned concludes that they have done so. It is, therefore, **RECOMMENDED** that the settlement agreements be approved and the distributions permitted in accordance with those agreements with one caveat; that being that attorney's fee to be paid in infant and death claims are limited to no more than 33-1/3%[14].

The Clerk is directed to transmit the record in this case to Norman K. Moon, Senior United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned that is not

---

[14] Excepting, as noted above, those fee provisions at 35%.

specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusion reached by the undersigned may be construed by any reviewing court as a waiver of such objection.

It is the court's understanding from the parties that time is of the essence as regards the date by which the annuities must be purchased. Should the parties want the District Court to consider approving this Report and Recommendation before the 14 day period provided for in Rule 72(b), they should file with the court a pleading stating that they have no objection to this Report and Recommendation immediately.

Finally, although it has been recommended above that the settlement be approved in its entirety (except certain attorney fee provisions), the undersigned is mindful that to effectuate and implement the settlement, the District Court must issue specific directives to the Bankruptcy Court. The Trustee and Plaintiffs' counsel are hereby instructed to submit a proposed Consent Order consistent with this Report and Recommendation to Judge Moon, providing a mechanism to implement all the relevant terms of the settlement agreement.

       Entered: August 25, 2010.

       /s/ Michael F. Urbanski
       Michael F. Urbanski
       United States Magistrate Judge